UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MELISSA SEGUIN,

               Plaintiff,

-vs-                                 Case No.  5:13-CV-96-Oc-10PRL

MARION  COUNTY  HEALTH
DEPARTMENT,

               Defendant.
_____/

# O R D E R

Plaintiff Melissa Seguin alleges that her current employer, Defendant Marion County Health Department, has interfered with her rights and benefits under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA"), and has retaliated against her for exercising those rights in violation of the FMLA and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.* ("FCRA") (Doc. 20).  The Department has moved for summary judgment (Doc. 33), to which Ms. Seguin has filed a response in opposition (Doc. 39).   Upon due consideration, and for the reasons discussed below, the Court finds that the Marion County Health Department's motion is due to be granted as to Ms. Seguin's interference claim, and granted in part and denied in part as to the retaliation claims.

**Undisputed Material Facts**

**I.**     **The Parties**

Plaintiff Melissa Seguin has three children:  twin daughters Arianna and Tianna born September 20, 2000, and a son David born November 21, 2002.  Arianna and David have both been diagnosed with autism, and require constant care and supervision.  Arianna has high-functioning autism and is able to attend regular school classes with support.  David's autism is more severe; he is nonverbal, prone to violent outbursts resulting in self-inflicting injuries and property damage, and is unable to groom himself.

Ms. Seguin resides with her children and her husband in Ocala, Florida.  During the relevant time periods for this case, Arianna and David both attended Maplewood Elementary Public School in Marion County, Florida.[1]  Maplewood Elementary has an autism center and provides services for autistic students and those with other special education needs.

Ms. Seguin was hired by the Marion County Health Department ("the Department") on October 21, 2005.  Her first position was as a cashier for the Department's fiscal office in the Ocala clinic, which is located approximately a five minute drive away from Maplewood Elementary.  The Department promoted Ms. Seguin to the position of Interviewing Clerk in the fiscal office on December 15, 2006.

---

[1]Arianna now attends a public middle school and David attends the Ocala Autism School.

She remained in this position until October 2011, when she accepted a lateral transfer to a Fiscal I position in a different section of the Ocala clinic.  Ms. Seguin is still employed by the Department in the Fiscal I position as of the date of this Order.  Her work schedule is Monday through Friday, 8 a.m. to 5 p.m., with an hour for lunch.

During her tenure at the Department, Ms. Seguin has been supervised by several different persons.  From October 2005 until some point in 2007, Ms. Seguin's immediate level supervisor was Rose Winter.  Next, Ms. Seguin was supervised by Maryellen Enos for a short period of time in 2007.  Then Ivette Escobar-Givens supervised Ms. Seguin from late September 2007 to September 2010.  Patricia Johnson Duran became Ms. Seguin's immediate level supervisor on September 13, 2010 until November 12, 2010.  At that point in time, Charity Woodburn became Ms. Seguin's immediate level supervisor until November 2011.

At all times, Ms. Seguin's next level supervisor was Cheryl Brown, the Department's Business Manager, and now acting Health Officer.   Ms. Brown also operated as Ms. Seguin's immediate level supervisor from November 2011 until June 2013.  At that point in time, Katherine Kash, the Department's Support Services Administrator, became Ms. Seguin's immediate level supervisor, and remains as such as of the date of this Order.  At all relevant times, Ms. Kash has also been the head of the Department's Human Resources office.

## II.    Ms. Seguin's FMLA Leave Requests

When an employee at the Department requests FMLA leave, the employee must notify her immediate supervisor that she is experiencing an FMLA-qualifying event. The supervisor then completes an FMLA leave request form, which is signed by both the employee and the supervisor and transmitted to the Department's Human Resources office.   Human Resources completes the form, and explains to the employee her rights under the FMLA, as well as the need for a completed physician's certification.   Once the employee provides the physician's certification, Human Resources evaluates the leave request and notifies the employee whether the leave has been approved.

FMLA leave at the Department is classified as unpaid leave.   However, employees are permitted to apply any accrued paid time off, such as annual leave or sick leave, towards their FMLA leave.  The Department allows the employee to make the election of whether or not to apply paid time off to an FMLA leave event.  See 29 C.F.R. § 825.207.

Ms. Seguin followed this process and first applied for intermittent FMLA leave[2] on June 11, 2007 in order to provide care for her two autistic children.  At that time, her husband began working an irregular schedule at his job, and Ms. Seguin required

_____

[2]"FMLA leave may be taken intermittently. . . .   Intermittent leave is FMLA leave taken in separate blocks of time due to a single qualifying reason."  29 C.F.R. § 825.202(a).  Intermittent leave "may include leave of periods from an hour or more to several weeks."  29 C.F.R. § 825.202(b)(1).

FMLA leave in order to transport her children to and from school, and to and from doctor appointments.  Ms. Kash found that Ms. Seguin qualified for FMLA leave and approved her request for intermittent FMLA leave on June 15, 2007.[3]

Although the Department found that Ms. Seguin qualified for leave, because the leave was on an occasional, intermittent basis, Ms. Seguin was required to submit written leave requests to her immediate level supervisor every time she needed to be absent from work.  Since June 15, 2007, Ms. Seguin has submitted hundreds of FMLA leave requests to care for her children.  Most of these requests were for no more than a few hours at a time.  Ms. Seguin testified under oath at her deposition that the Department never denied any of her leave requests.  (See Doc. 35-1, p. 31).

Whenever Ms. Seguin needed to take leave she would fill out a request form and give it to her immediate level supervisor.  Sometimes she was able to fill out the requests days or weeks in advance, sometimes she submitted the requests on the day that she needed to take leave, and in some emergency situations she submitted her leave requests after she returned to work.  Oral leave requests were discouraged, however on occasion Ms. Seguin did call in and request leave, which was then followed up with a written request at a later date.  Regardless of the timing or manner in which Ms. Seguin submitted her leave requests, they were never denied.

---

[3]There appears to be no dispute that Ms. Seguin is an eligible employee under the FMLA, that she properly submitted documentation from her children's treating physician on an annual basis, and that she continuously qualified for FMLA leave to care for her children from June 2007 to date.

Ms. Seguin testified at her deposition that there were occasions when her immediate level supervisor would initially deny her FMLA request, either because the supervisor did not believe the leave was for an FMLA-qualifying event, or because the Department was short staffed at the time.   However, either Ms. Seguin or the supervisor would then speak to either Ms. Brown or to Ms. Kash, and the FMLA leave would be approved in advance of the actual leave date.   Ms. Seguin further testified that there were occasions when it would take several hours or days to have a leave request approved, and that there were times when she would have to remind her supervisor to approve the leave request.   However, she admitted that her leave requests were always approved.

Ms. Seguin has also presented some evidence that Cheryl Brown would make negative comments to other employees that Ms. Seguin "was taking too much time [off]," and that Ms. Brown was upset about how much leave Ms. Seguin took.   Ms. Seguin also testified at her deposition that at times when she submitted her FMLA leave requests, Ms. Brown would question Ms. Seguin about her need to take leave. For example, Ms. Brown would ask Ms. Seguin if her children were eligible for or could take bus service to and from school, if her husband could pick up the children, or if Ms. Seguin ever intended on obtaining babysitting or other caregiver services for her children.[4]   Ms. Seguin testified that such questions made her feel badly about taking

---

[4]Cheryl Brown denies make such inquires or any negative comments.

leave, and made her think that taking FMLA leave was a privilege as opposed to a right.  Regardless of whether such questions were asked of Ms. Seguin it bears repeating that <u>none</u> of her leave requests were ever denied, and there is no evidence that such questioning ever prevented Ms. Seguin from making an FMLA leave request.[5]

Despite repeatedly testifying that her FMLA leave requests were always approved, Ms. Seguin cites five events in support of her claim that she was denied FMLA benefits.

(1)    In 2011, Ms. Seguin would occasionally request that she be allowed to take a shorter lunch break in lieu of taking FMLA leave to pick up or drop off her children.  In other words, she was requesting to use her work hours to care for her children instead of taking approved FMLA leave.  It appears that the majority of these requests to take a shorter lunch break were denied, but she was always granted FMLA leave for each request.

(2)    Ms. Seguin requested the day off on April 4, 2011 to care for her children.  Charity Woodburn, her immediate level supervisor at the time, approved the leave as "non-FMLA" leave under the Florida Family Supportive Work Program ("FSWP").[6]  It

_____

[5]Ms. Seguin also stated that she is required to email Ms. Kash (her current immediate level supervisor) every day to notify her whether or not she will be taking FMLA leave that day.

[6]The FWSP is a state program that provides for up to six months of protected unpaid leave for employees dealing with family medical issues. Unlike the FMLA, the FWSP only provides for leave for medical issues related to family members – it does not cover leave for an employee's
(continued...)

is not clear whether anyone at the Department ever reclassified this leave as FMLA leave; however it is undisputed that Ms. Seguin was granted unpaid leave for April 4, 2011, and that the leave would have also been unpaid if it had been classified as FMLA leave.  (Doc. 43-9, Ex. 7).

(3)   Ms. Seguin requested FMLA leave for the entire day on May 5, 2011, and from 1 p.m. to 5 p.m. on May 12, 2011.  Ms. Woodburn approved the leave, but marked the leave request form as both FMLA and "non-FMLA" leave.  While this appears to be a clerical error, it is not clear from the record whether the leave was categorized in Ms. Seguin's personnel records as FMLA or non-FMLA leave.  Again, however, it is undisputed that Ms. Seguin was granted leave for these dates, and that the leave would have been – and was – unpaid leave regardless of its classification.

(4)   On August 19, 2013, Ms. Seguin asked for 3 hours of FMLA leave.  Ms. Kash approved the leave, however, she marked the leave request form as "non-FMLA" leave by mistake.  At her deposition, Ms. Kash confirmed that this was qualified FMLA leave.  It is not clear from the record whether anyone at the Department ever corrected Ms. Seguin's personnel records to reflect that this leave was actually FMLA leave.  It is undisputed, however, that Ms. Seguin took the 3 hours of leave, and that the leave was unpaid regardless of whether it was classified as FMLA or non-FMLA.

---

[6](...continued)
own medical issues.  The FWSP is in addition to the FMLA, thus an employee could in theory take 12 weeks of unpaid leave for her own medical condition, and an additional 6 months for a family member's health issues.

(5)     Ms. Seguin last points to an incident in late Summer 2013.  Ms. Seguin asked for an hour of leave in order to attend orientation at the middle school Arianna would be attending that Fall.  The leave was not for purposes of transporting Arianna to or from school or to a doctor's appointment, or to provide Arianna any medical care.  Ms. Seguin never submitted any documentation from any physician suggesting that attending this orientation was required as part of the care for Arianna's serious health condition.  Ms. Kash allowed Ms. Seguin to take leave to attend the orientation, but categorized the leave as non-FMLA administrative leave.

### III.    The Accountant I Position

On September 7, 2010, the Department terminated the employment of Ms. Seguin's then-immediate level supervisor, Ivette Escobar-Givens.  At the time Ms. Escobar-Givens held the position of Accountant I Fiscal Supervisor in the fiscal office.  Soon after her termination, the Department made Patricia Johnson Duran (then employed as an Accountant II Fiscal Supervisor in the fiscal office) Ms. Seguin's immediate level supervisor.  Ms. Johnson Duran was aware that Ms. Seguin qualified for and took intermittent FMLA leave to care for her children.  There is no evidence that Ms. Johnson Duran ever denied any of Ms. Seguin's FMLA leav e requests.

From September 17-22, 2010, the Department advertised, both internally and externally, for a replacement for the Accountant I Fiscal Supervisor position.  Ms.

Seguin learned of the position opening on September 17, 2010 and decided to apply.[7]

The Accountant I position was a supervisory position and would have been a promotion for Ms. Seguin. It is undisputed that the Department required a successful candidate for the Accountant I position to have, among other qualifications, a minimum of five years of supervisory experience, and to have supervised at least 5 employees. It is also undisputed that Ms. Johnson Duran, along with another supervisor, Ann Dorenza, reviewed all of the applications, conducted the job interviews, and that Ms. Johnson Duran alone made the decision of who to hire.[8]

Persons who applied for the Accountant I position answered some preliminary screening questions online, and completed a multi-page application. The preliminary questions and applications were received and scored by an outside company called People First. In response to the preliminary questions, Ms. Seguin stated that she had zero years of supervisory experience, and had supervised zero employees (Doc. 43-7, p. 14). However, on her written application Ms. Seguin stated that she had some prior

---

[7]Ms. Seguin contends that Ms. Johnson Duran encouraged her to apply for the Accountant I position, told Ms. Seguin that she was the most qualified, and acknowledged that Ms. Seguin was already doing most of the job duties, so that it made sense that Ms. Seguin would get the promotion. Ms. Johnson Duran denies ever making these statements, although she admits telling Ms. Seguin that if she thought she was qualified, to go ahead and apply. Ms. Seguin also testified that she was performing several of the Accountant I job duties already, such as performing audits and conducting clinic counts, but admitted that none of the duties were supervisory in nature.

[8]Ms. Seguin contends that Ms. Brown was involved in the interview and hiring process but the record is devoid of any evidence to support this assertion. To the contrary, Ms. Brown was out on medical leave during the time period that Ms. Johnson Duran conducted the applicant interviews.

supervisory experience supervising six cashiers when she worked in New York. People First ultimately scored Ms. Seguin's application at a 75 out of 100.

Ms. Seguin did not receive the promotion and was not interviewed for the position.  Ms. Seguin contends that she was denied the Accountant I position as well as an interview due to the fact that she was frequently out  on intermittent FMLA leave. Although Ms. Seguin admits that her responses to the preliminary questions conflicted with her answers on her application with respect to her supervisory experience, she claims that she should have been given an opportunity to explain these inconsistencies in an interview for the position.

Ms. Johnson Duran testified at her deposition that she did not consider Ms. Seguin for the position and did not interview her due to Ms. Seguin's responses to the preliminary screening questions that she had no supervisory experience.  With respect to Ms. Seguin's conflicting answers on her application, Ms. Johnson Duran testified that she considered the inconsistencies as proof that Ms. Seguin had lied on her application, and therefore Ms. Seguin's application did not merit any further consideration.  Ms. Johnson Duran further testified that no one ever told her not to interview or hire Ms. Seguin due to the fact that she took FMLA leave.

Ms. Johnson Duran interviewed and ultimately hired Charity Woodburn for the Accountant I position.  Ms. Woodburn also scored a 75 on her application.  In response to the preliminary screening questions, she listed 15 years prior supervisory experience over approximately 24 employees.  However, on her application, Ms. Woodburn listed

a lower number of years of supervisory experience.  When questioned at her deposition, Ms. Johnson Duran stated that Ms. Woodburn was able to explain away this inconsistency at her interview.[9]

Ms. Johnson Duran testified that she made the decision to hire Ms. Woodburn because she had extensive supervisory experience, and had worked in the banking industry for a prolonged period of time.  Although Ms. Woodburn had no experience in the medical field, Ms. Johnson Duran felt that her banking, finance, and supervisory experience weighed heavily in favor of hiring her, particularly since the Accountant I position was in the fiscal office.

Ms. Johnson Duran did not tell Ms. Seguin that she was not being considered for the Accountant I position.  Instead, Ms. Seguin learned that Ms. Woodburn had been hired during an employee meeting in November 2011 shortly before Ms. Woodburn began her employment.  During the course of the meeting, Ms. Seguin became very upset and stated in a raised voice that she would not train Ms. Woodburn.

It appears that Ms. Johnson Duran and Ms. Seguin did not get along well.  Ms. Johnson Duran testified that she experienced a lot of conflict working with Ms. Seguin and that Ms. Seguin was constantly harassing her and complaining about her to others. On September 14, 2010, Ms. Johnson Duran gave Ms. Seguin an "Interoffice Memorandum" entitled "Documented Counseling."   (Doc. 43-2, p. 12).   The

---

[9]Ms. Woodburn testified at her deposition that she had more than 10 years of supervisory experience at the time she was hired by the Department.

memorandum stated that "slandering, offensive remarks have been said by fiscal employees to their co-workers about certain employees in the presence of co-workers with the potential to be overheard by customers," and that such conduct constitutes "Conduct Unbecoming a Public Employee." Id.  The memorandum concluded with a warning that Ms. Johnson Duran would be monitoring Ms. Seguin's behavior in the workplace and that any further violations could result in disciplinary action.[10]  Other than this interoffice memorandum, Ms. Seguin has never been subject to any disciplinary action while employed by the Department.

On March 24, 2011, Ms. Johnson Duran wrote to Human Resources and to upper management asking that Ms. Seguin be fired due to her poor behavior and bad attitude.  At the same time, Ms. Johnson Duran asked to be removed as supervisor and transferred to another department.  In April 2011, the Department moved her to a non-supervisory Fiscal Clerk position, where she remained until she resigned in June 2011.  No action was taken against Ms. Seguin by anyone at the Department based on Ms. Johnson Duran's letter.

As fate would have it, Ms. Woodburn turned out to be a poor employee as well. Ms. Brown terminated her employment in November 2012 due to her inability to perform her job duties.  Because the Department was undergoing budgetary cutbacks

---

[10]Ms. Seguin testified that all employees in the fiscal office received this interoffice memorandum, and that she was not singled out by Ms. Johnson Duran for discipline or counseling.

at the time, the Department did not re-advertise the Accountant I position.  Instead, the job duties were redistributed among other existing employees.[11]  Ms. Seguin has not applied for any other promotions at the Department.

**IV.    The Transfer to The Belleview and Reddick Clinics**

On December 2, 2010, Ms. Seguin filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), in which she claimed that she had been denied the Accountant I promotion due to the fact that she had to care for her autistic children.[12]  Four months later, on April 15, 2011, Ms. Brown transferred Ms. Seguin to the Department's clinic in Belleview, Florida.  Ms. Brown testified that she made the decision to transfer Ms. Seguin because she was the most skilled interview clerk, and they needed her at the Belleview clinic to train other employees.  However, Ms. Johnson Duran, Ms. Woodburn, and Ms. Kash each testified that Ms. Brown transferred Ms. Seguin because she was insubordinate, a disruptive influence at the Ocala clinic, and was having problems working with her supervisor.   In addition, Ms. Seguin contends that she never trained any employees upon her transfer.

---

[11]Ms. Seguin contends that the Department deliberately refused to re-advertise the Accountant I position in order to prevent her from applying for the position again.

[12]It appears that Ms. Seguin was asserting violations of the Americans With Disabilities Act. Ms. Seguin received a notice of right to sue, but never filed a lawsuit based on this EEOC charge.

Ms. Seguin's job title, salary and supervisor remained the same after the transfer.  There is no evidence that this transfer impacted Ms. Seguin's eligibility for FMLA leave, and she does not allege that any FMLA leave requests were denied while she worked at the Belleview clinic.

The Belleview clinic is located approximately 11 miles farther away from Maplewood Elementary than the Ocala clinic, however it is located closer to Ms. Seguin's home.  Thus, when Ms. Seguin took intermittent FMLA leave to pick up or drop off her children at school, she was now required to take longer periods of leave to account for the additional traveling time.  Ms. Seguin repeatedly asked not to be transferred to the Belleview clinic due to the extra travel time, but her requests and complaints were ignored.

In June 2011, Ms. Seguin learned that the Belleview clinic was closing.  Ms. Seguin, along with nine other Department employees, received a memorandum dated June 10, 2011 notifying them that instead of being laid off, they would start splitting their work weeks between the Belleview and Reddick clinics.  Each employee's job title and salary remained the same.  As of July 1, 2011, Ms. Seguin began working three days at the Belleview clinic and two days at the Reddick clinic.  The Reddick clinic was located about 15 miles from Maplewood Elementary.  There is no evidence that this transfer impacted Ms. Seguin's eligibility for FMLA leave, and she does not allege that any FMLA leave requests were denied while she worked at the Reddick clinic.

On June 15, 2011, after learning that she would be splitting her work days between the Belleview and Reddick clinics, Ms. Seguin filed a second EEOC charge. The second charge asserts that her transfer to the other clinics was in retaliation for filing her December 2, 2010 EEOC charge.  Ms. Seguin received a notice of right to sue, and filed this lawsuit within the appropriate limitations periods.

Eventually, both the Belleview and Reddick clinics shut down.  However, while some Department employees were laid off, Ms. Seguin was not.  She instead accepted a lateral transfer to a Fiscal Assistant I position in the Ocala clinic, starting in October 2011.  The Fiscal Assistant I position was in a different section of the Department, but had the same salary, and same schedule as the interview clerk position.

It is State of Florida policy that all employees who begin a new position (whether by new hire, promotion, or transfer) are placed on a one-year probationary period.  See Deposition of Ana Gray, Doc. 35-7, pp. 35-36.  Ms. Seguin was aware that she would be placed on probation for one year if she accepted the transfer, which she did.[13] When she returned to the Ocala clinic, Ms. Seguin claims that she was harassed and attacked by Ms. Brown and other employees because she was placed in this new position, was not properly trained for her new position, and was prohibited from entering the cashiers area in the fiscal office.

---

[13]Ms. Seguin claims that several co-workers told her that lateral transfers were exempt from this probation requirement.

## V.    Other Instances of Alleged Retaliation

Ms. Seguin contends that she was constantly subjected to harassment and retaliation for taking FMLA leave.  In addition to the incidents described above, Ms. Seguin points to numerous comments made by other employees.  For example, in 2007, Ivette Escobar-Givens informed Ms. Seguin that Cheryl Brown instructed her to give Ms. Seguin a low performance evaluation in 2007 due to all the FMLA leave she was taking.[14]  However, Ms. Seguin's evaluation that year received an overall "exceeds expectations" rating.  And several years after Ms. Escobar-Givens had ceased working for the Department, she ran into Ms. Seguin and told her that she would never be promoted because she takes too much time off from work.

Ms. Seguin also claims that after Charity Woodburn was fired, she contacted Ms. Seguin and told her that Ms. Brown had instructed Ms. Woodburn to harass Ms. Seguin in retaliation for filing the December 2010 EEOC charge.  In addition, Ms. Woodburn testified that Ms. Brown instructed her to discipline Ms. Seguin for "nit-picky," minor infractions.  However, Ms. Woodburn further testified that she refused to discipline Ms. Seguin for such issues, and that Ms. Brown singled out other employees for such treatment who were not taking FMLA leave.  Ms. Seguin also asserts that Ms.

---

[14]Ivette Escobar-Givens testified that she never made any such statements to Ms. Seguin. She further testified that Cheryl Brown instructed her not to give any of her employees very high performance evaluations because none of her employees were outstanding performers.

Brown required her to be retrained on tasks that she had already been performing for substantial periods of time.

In January 2013, Ms. Seguin asked Ms. Brown for intermittent leave from 8 a.m. to 9:30 a.m. and from 4:30 p.m. to 5:00 p.m. every day.  Because Ms. Seguin was now asking for daily leave, and was also requesting to take only a 30-minute lunch break, Ms. Brown suggested that Ms. Seguin switch to a flexible work schedule.  This would result in a change to Ms. Seguin's daily schedule so that her work day would start at 9:30 a.m. instead of at 8:00 a.m., but would still end at 5:00 p.m.  As such, Ms. Seguin would only have to take up to 30 minutes of intermittent FMLA leave each day, instead of 2 hours.

Ms. Seguin unfortunately did not understand how the flexible work schedule would work.  She apparently contacted someone at People First, who misinformed Ms. Seguin that a flexible work schedule equated to part time employment, and would result in a loss of FMLA leave benefits, as well as the inability to apply any accrued paid time off towards her FMLA leave.  Although Ms. Brown and Ms. Kash both attempted to explain to Ms. Seguin that she would not be considered a part time employee, nor would she lose the ability to take intermittent FMLA leave, Ms. Seguin refused to switch to a flexible work schedule.  The Department did not push the issue

any further and to date has allowed Ms. Seguin to remain on a normal 8 a.m. to 5:00 p.m. work schedule, with intermittent FMLA leave as needed.[15]

### Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In applying this standard, the Court must examine the materials on file and record evidence "in the light most favorable to the nonmoving party."  Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  When faced with a "properly supported motion for summary judgment [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).   The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

At the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511

---

[15]Although Ms. Seguin has not lost any of her FMLA benefits, she still seems confused, and contends that Cheryl Brown attempted to "trick" her into switching to a flexible work schedule and in turn losing her FMLA leave.

(1986). Some degree of factual dispute is expected, but to successfully counter a motion for summary judgment the factual dispute must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248, 106 S.Ct. at 2510.

## Discussion

The FMLA grants an eligible employee the right to take up to 12 workweeks of unpaid leave annually for any one or more of several reasons, including '[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). The Parties agree that at all times relevant to this case, Ms. Seguin is and has been an "eligible employee" as defined by the FMLA, see 29 U.S.C. § 2611(2), and that her children's autism qualifies as a "serious health condition" for which Ms. Seguin is entitled to take intermittent FMLA leave. Ms. Seguin contends, however, that the Department unlawfully interfered with her right to take intermittent leave to care for her children, and retaliated against her for taking such leave and for filing an EEOC charge.

## I. FMLA Interference Claim

In order to protect an eligible employee's right to take FMLA leave, the Act allows, among other things, for an employee to bring a private cause of action for interference. See 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to

interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act].").  "To prove FMLA interference, an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA."  Martin v. Brevard County Public Schools, 543 F.3d 1261, 1266-67 (11th Cir. 2008).  "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220.  "An employee need not 'allege that his employer intended to deny the right; the employer's motives are irrelevant.'"  Id. (Quoting Strickland v. Water Works Sewer Bd. of Birmingham, 239 F.3d 1199, 1206-07 (11th Cir. 2001)).

Based on the material undisputed facts of this case, it is clear that summary judgment in favor of the Department is warranted on Ms. Seguin's interference claim because she has failed to present any evidence that she was ever denied any rights under the FMLA, or that the Department discouraged her from exercising her rights under the Act.  To the contrary, Ms. Seguin has repeatedly testified under oath that since she first requested intermittent FMLA leave in June 2007, she has submitted hundreds of FMLA requests, and the Department has never denied a single request.

Ms. Seguin references three types of conduct which she contends discouraged her from taking FMLA leave:  (1) the various alleged comments and inquiries by Ms. Brown about Ms. Seguin's leave (many of which may arguably constitute hearsay

and/or were made far outside any applicable limitations period);[16] (2) the occasional brief delays in approving Ms. Seguin's FMLA leave requests; and (3) the fact that at times the leave requests were initially denied but then approved by upper management or Human Resources.  Assuming all of these comments, questions, and events took place, as the Court must at this stage of the case, there is a complete absence of any evidence in the record that they operated to actually discourage Ms. Seguin from requesting any FMLA leave, denied her any FMLA benefits, or harmed her employment or other employee benefits.

To bring a successful FMLA interference claim, a plaintiff must be able to show that she suffered some sort of prejudice as a result of the interference.  In Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 122 S. Ct. 1155 (2002), the United States Supreme Court determined that a Department of Labor regulation was invalid because it "alter[ed] the FMLA's cause of action in a fundamental way . . . [by] reliev[ing] employees of the burden of proving any real impairment of the rights and resulting prejudice."  Ragsdale, 535 U.S. at 90, 122 S. Ct. at 1162.  The Court then explained that 29 U.S.C. § 2617, the FLMA's enforcement provision,

> provides no relief unless the employee has been prejudiced by the violation:  The employer is liable only for compensation and benefits lost "by reason of the violation," § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(A)(i)(II),

---

[16]The limitations period for an FMLA claim is two years, and if the employer's violations are willful, the limitations period is extended to three years.  29 U.S.C. § 2617(c)(1), (2).  Neither Party has raised any statute of limitations issues in this case to date.

and for "appropriate" equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B).  The remedy is tailored to the harm suffered.

Id. at 89, 122 S. Ct. at 1161.

This Circuit and other courts have followed Ragsdale and have held that an interference claim cannot lie where there is no actual prejudice to the employee.  See Demers v. Adams Homes of Northwest Florida, Inc., 321 Fed. Appx. 847 (11th Cir. Mar. 20, 2009) (affirming summary judgment for employer where employee failed to articulate any harm or prejudice by the purported FMLA violation); Juback v. Michaels Stores, Inc., 2014 WL 3720540 (M.D. Fla. July 23, 2014) (dismissing FMLA interference claim where plaintiff did not allege that employer's failure to provide information about plaintiff's FMLA rights prejudiced him in any way); Ridings v. Riverside Med. Ctr., 537 F.3d 755, 764 (7th Cir. 2008) (employer entitled to summary judgment on interference claim where employee did not allege that employer's initial failure to provide FMLA information resulted in prejudice).  Cf., Mardis v. Central Nat. Bank & Trust of Enid, 173 F.3d 864, 1999 WL 218903 (10th Cir. April 15, 1999) (threatening employee with loss of accrued vacation as a condition for taking FMLA leave – the loss of an employee benefit – raises an interference claim).

Here, Ms. Seguin testified that the various events and comments about which she complains made her feel badly, or made her feel that taking FMLA leave was a privilege and not a right.  However, she did not testify or argue that these occurrences ever coerced her into refraining from submitting a leave request or that she was denied

leave on the basis of such conduct.  It is undisputed that she has received all of the FMLA leave that she has requested.  Consequently, she cannot show that she suffered any prejudice as a result of the Department's alleged interference with her FMLA rights.

Moreover, the Court is not aware of any legal authority - and Ms. Seguin has not cited to any – that precludes an employer from making occasional inquiry about an employee's FMLA leave; that requires instantaneous approval of a request for FMLA leave; or that finds a violation of the FMLA where an employee sporadically has to seek approval for leave from a next level supervisor.[17]  According to Ms. Seguin, any delays were of a few hours or at most a few days, and the leave requests were always approved prior to the date she took leave.  This clearly does not equate to interference.  Cf. Bender v. City of Clearwater, 2006 WL 1046944 at * 11 (M.D. Fla. April 19, 2006) ("Significantly, Plaintiff has not shown that the City's alleged delays in processing and approving her [FMLA] leave resulted in a denial of a right or benefit.").  Moreover, the fact that one of Ms. Seguin's various immediate level supervisors may have at times

_____

[17]Ms. Seguin's citation to Lynch v. City of Largo, 2011 WL 4634020 (M.D. Fla. Oct. 5, 2011) is unpersuasive and factually distinguishable.  In Lynch, the plaintiff was subject to "interrogation" by her supervisor in his office on two occasions about her need for FMLA leave and her medical condition, and her employment was terminated a few days after the second "interrogation."  In contrast, Ms. Seguin was never subjected to any such interrogation, she remains employed to date, and she continues to ask for FMLA as of the date of this Order.  See Dittle v. United States Postal Service, 2005 WL 263897 (D. Minn. Feb. 2, 2005) (court rejected interference claim because inappropriate comments by employer criticizing employee for taking FMLA leave did not have a chilling effect on employee taking leave); McKinzie v. Sprint/United Mgmt. Co., 2004 WL 2634444 (D. Kan. Nov. 16, 2004) (sarcastic and derogatory remarks by employer about plaintiff taking time off for FMLA leave did not constitute an interference claim).

initially denied a leave request, which was quickly then approved by Ms. Brown or Ms. Kash does not establish any interference with Ms. Seguin's FMLA rights.  It bears repeating that Ms. Seguin <u>was never denied any leave that she requested</u>.[18]

The five instances Ms. Seguin points to where she requested FMLA leave and claims such leave was denied (<u>supra</u> pp. 7-9) also fail to create a material issue of disputed fact.  Her request to take a shorter lunch break in lieu of FMLA leave clearly does not equate to interference with any FMLA rights, as she was not discouraged from taking any was not denied any FMLA leave to which she was entitled.  Rather, she was asking to use her work hours in lieu of taking leave, and she has not submitted any legal authority suggesting that such an outcome is required by the FMLA.

The April 4, 2011, May 5, 2011, and August 19, 2013 leave requests also fail to create an interference claim.  In all three instances, Ms. Seguin was granted unpaid leave.  It appears that the leave requests were either marked "non-FMLA" leave in error, or she was given an alternative form of unpaid leave which, notably, <u>would not have resulted in any reduction in her existing FMLA leave</u>.  And even if these three

---

[18]Ms. Seguin's reference to Ms. Brown's and Ms. Kash's attempt to "trick her" into switching to a flexible work schedule is nonsensical at best.  The undisputed facts show that Ms. Seguin would have been entitled to take FMLA leave while on an flexible work schedule, that Ms. Brown and Ms. Kash were actually trying to provide Ms. Seguin with an option that would permit her to conserve her leave, and that Ms. Seguin was never denied any FMLA benefits.  For the same reasons, Ms. Seguin's complaint that she is now required to send daily emails to Ms. Kash (her current immediate level supervisor) notifying her whether or not she is taking FMLA leave that day does not constitute interference.  Simply put, there is no evidence that sending daily emails has prevented Ms. Seguin from asking for or taking any intermittent FMLA leave.

instances could constitute a violation of the Act, "even where there may have been technical violations of the FMLA, those violations are not compensable where . . . a plaintiff has failed to demonstrate that [she] suffered any 'adverse employment action.'" Drago v. Jenne, 453 F.3d 1301, 1307 (11th Cir. 2006).  It is undisputed that regardless of how the leave forms were marked by the approving supervisor, each of these leave requests were approved, and Ms. Seguin received unpaid leave – the same type of leave she would have received under the FMLA.[19]  Thus, the alleged violations constitute nothing more than record keeping or accounting errors that could be easily corrected on the books, but there is no evidence that Ms. Seguin has sought or been denied that remedy; and, as a consequence, she cannot show that she has been prejudiced in any way.

The last leave request in late Summer 2013 is a red herring as Ms. Seguin has not submitted any evidence, beyond her own personal opinion, that attending a one hour middle school orientation program qualified as providing medical care for her daughter Arianna.  In order to constitute a claim of interference, Ms. Seguin must show that she sought leave for an FMLA-qualifying event.  See 29 C.F.R. §§ 825.112(a)(3); 825.113(c).  She has not done so.  More importantly, the Department granted Ms. Seguin one hour of administrative leave to attend the orientation, thus Ms. Seguin has again failed to demonstrate any prejudice.

---

[19]Ms. Seguin has not submitted any evidence or made any argument that she requested paid leave for any of these dates.

Even when all of these events are viewed in combination, they do not rise to the level that this Circuit and other courts have found may constitute FMLA interference. Cf. Evans v. Books-A-Million, — F.3d —, 2014 WL 3882506 (11th Cir. Aug. 8, 2014) (noting that comments by employer that resulted in employee actually continuing to work while on FMLA maternity leave demonstrated, at the very least, that the employer discouraged the employee from asserting her FMLA rights); Saroli v. Automation & Modular Components, Inc., 405 F.3d 446, 454 (6th Cir. 2005) (employer discouraged employee from exercising her rights under the FMLA when it failed to respond to her inquiries and inform her of her eligibility for leave); Foraker v. Apollo Group, Inc., 427 F. Supp. 2d 936, 942 (D. Ariz. 2006) (noting that only "non-trivial" employment actions that would deter reasonable employees are actionable).  In sum, Ms. Sequin has not provided evidence from which a reasonable jury could find that the Department either denied her an FMLA benefit, or discouraged her from taking leave.[20]

_____

[20]An interference claim based upon alleged acts of "discouragement" should be judged on the basis of an objective standard: would a reasonable employee in the same circumstances be dissuaded from exercising any FMLA benefit because of such discouragement?  See e.g. Di Giovanna v. Beth Israel Med. Ctr., 651 F. Supp. 2d 193 (S.D.N.Y. 2009); Ridgeway v. Royal Bank v. Scotland Group, 2013 WL 1985016 (D. Conn. May 13, 2013); Vess v. Scott Medical Corp., 2013 WL 1100068 (N.D. Ohio Mar. 15, 2013).  Under that test, the undisputed facts of this case do not suggest conduct that would have dissuaded a similarly situated employee of ordinary resolve from exercising her FMLA rights.  But even if a subjective test is applied in this case, there is no evidence that Ms. Seguin was in fact discouraged from pursuing – and receiving – any of her FMLA benefits.

The Court concludes that Plaintiff has not demonstrated a genuine issue of material fact with regard to her interference claim and the Department is entitled to judgment as a matter of law on this claim.

## II.   FMLA Retaliation Claim

Ms. Seguin has also asserted a claim of retaliation under the FMLA. Specifically, she contends that the Department denied her a promotion to the Accountant I position, transferred her to the Belleview and Reddick clinics, attempted to "trick" her into switching to a flexible work schedule, and placed her on probation when she returned to the Ocala clinic, all in retaliation for exercising her rights under the FMLA.

To establish a retaliation claim, an employee must demonstrate that her employer intentionally discriminated against her for exercising a right guaranteed under the FMLA. Martin v. Brevard Cnty. Pub. Sch., 543 F.3d 1261, 1267 (11th Cir. 2008). Such intentional discrimination can be shown by either direct evidence or circumstantial evidence applying the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). See Dixon v. Hallmark Cos., Inc., 627 F.3d 849, 854 (11th Cir. 2010).

Direct evidence of discrimination "reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting Damon v.

Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999)).  "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." Dixon, 627 F.3d at 854 (quoting Wilson, 376 F.3d at 1086).  "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is considered circumstantial evidence."  Akouri v. Fla. Dep't of Transp., 408 F.3d 1338, 1347 (11th Cir. 2005) (citing Wilson, 376 F.3d at 1086).

     The evidence Ms. Seguin points to does not rise to this level.  She argues that Ms. Brown's comments and questions about her intermittent FMLA leave, coupled with hearsay statements by other employees that Ms. Brown was not happy about how much leave Ms Seguin took, constitute direct evidence of retaliation.  But nothing in these comments, questions, or employee statements show that Ms. Seguin was denied a promotion, transferred, tricked into a flexible work schedule, or placed on probation for taking FMLA leave.  These are not "the most blatant remarks" that Ms. Brown, Ms. Kash, or anyone else at the Department clearly possessed or acted upon a discriminatory motive towards Ms. Seguin.

     In the absence of direct evidence, Ms. Seguin can still defeat summary judgment by using circumstantial evidence and the McDonnell Douglas burden-shifting analysis. Under that framework, the employee bears the initial burden of establishing a prima facie case of FMLA retaliation.  A prima facie case of retaliation requires the employee to show that: (1) she engaged in a statutorily protected activity; (2) she suffered an

adverse decision; and (3) the decision was casually related to the protected activity. Martin, 543 F.3d at 1268.   If a prima facie case is established, the burden then shifts to the employer "to articulate a legitimate reason" for the action it took against the employee.   Hurlbert v. St. Mary's Health Care Sys., 439 F.3d 1286, 1297 (11th Cir. 2006).   Once such a reason is articulated, the employee must "show that the [employer's] proffered reason for the adverse action is pretextual." Id.   To survive summary judgment, specific facts showing pretext are needed; "[m]ere conclusory allegations and assertions will not suffice." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).

### A.    The Accountant I Promotion

There is no real dispute that Ms. Seguin satisfies the first two elements of her prima facie case with respect to the Accountant I promotion.  She was engaging in protected activity by requesting and taking FMLA leave, and she suffered an adverse employment action when she was denied the Accountant I promotion.  The Department argues, however, that she cannot establish a causal connection between the denial of the promotion and her FMLA leave.

The Court disagrees.  Ms. Seguin was continuously taking FMLA intermittent leave, including during the time when the decision not to promote Ms. Seguin was made.[21]  Therefore, the two events were in extremely close temporal proximity to each

---

[21]The Department attempts to argue a lack of temporal proximity by pointing out that Ms.
(continued...)

other, which is more than sufficient to create a genuine issue of material fact as to causal connection.  See Martin, 543 F.3d at 1268; Hurlbert, 439 F.3d at 1298. Moreover, it is undisputed that Ms. Johnson Duran, the person who made the decision to exclude Ms. Seguin from the interview process and to hire Charity Woodburn, was well aware that Ms. Seguin qualified for and frequently exercised her rights to intermittent FMLA leave.  Although Ms. Johnson Duran testified that no one instructed her not to hire Ms. Seguin for the Accountant I position based on her FMLA leave, Ms. Seguin has also presented evidence that comments had been made, primarily by Ms. Brown, suggesting a negativity towards Ms. Seguin due to her frequent leave requests. This evidence is sufficient to create a factual dispute, as well as a question concerning witness credibility, which can only be resolved by the ultimate trier of fact at trial.

The Court further finds that material issues of fact remain in dispute as to whether the Department's reason for not promoting Ms. Seguin was pretextual.  The reasons for which Ms. Johnson Duran chose not to promote Ms. Seguin can readily be called into question.  Ms. Johnson Duran testified that she presumed Ms. Seguin lied on her application because her answers concerning her supervisory experience conflicted with those given on the preliminary online screening questions.  However,

---

[21](...continued)
Seguin was first approved for FMLA leave in June 2007, and was denied the promotion in November 2010.  However, the Department has not submitted any legal authority, and the Court has not located any, which hold that for purposes of a retaliation claim you focus only on the first time that an employee engages in protected activity.

Ms. Johnson Duran interviewed and hired Charity Woodburn, who had the same application score as Ms. Seguin, and also gave conflicting answers on her application and preliminary screening questions.  Moreover, there is ample evidence demonstrating an animosity between Ms. Johnson Duran and Ms. Seguin, which could be related at least in part to Ms. Seguin's FMLA leave.  A reasonable jury could find pretext based on this evidence.  See Martin, 543 F.3d at 1268 (an employee can "show that the employer's proffered reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.").  Summary judgment will therefore be denied as it pertains to the Accountant I promotion.

### B.    The Transfer to the Belleview and Reddick Clinics

Summary judgment is also not warranted on Ms. Seguin's retaliation claims relating to her transfer to the Belleview and Reddick clinics.  Again she has satisfied the first two prongs of her prima facie case.  She was engaging in protected activity by requesting and taking FMLA leave.  And contrary to the Department's argument, Ms. Seguin arguably did suffer an adverse employment action by being transferred to two different clinics that were farther away from her child's school, resulting in the necessity of taking additional FMLA leave and missing more time from work.  See Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (An adverse employment action is one which "in some substantial way, alter[s] the employee's compensation, terms,

conditions, or privileges of employment, deprive[s] . . . [her] of employment opportunities, or adversely affect[s] . . . [her] status as an employee."). There are also material issues of fact in dispute as to whether the adverse action was causally connected to Ms. Seguin's FMLA leave. As with the denial of her promotion, Ms. Seguin was continuing to take intermittent FMLA leave while the decision was made to transfer her to the other clinics. This nearly simultaneous temporal proximity, coupled with the fact that the same person who made the decision to transfer Ms. Seguin also approved many of her FMLA leave requests (Cheryl Brown), and purportedly made negative comments about Ms. Seguin's FMLA leave, is more than enough to at least create fact issues concerning Ms. Seguin's prima facie case.

The Court also finds that factual issues abound as to the question of pretext. Ms. Brown's reasons for transferring Ms. Seguin – that she was the most qualified, they needed her skill sets at the other clinics, and she was needed to train other employees – can easily be called into question. First, several other employees have testified at deposition that Ms. Seguin was transferred because she was disruptive and a trouble maker, and because Ms. Brown was not happy with her. In addition, Ms. Seguin has testified (without contradiction) that she never trained any employees while at either clinic. Moreover, Ms. Seguin has presented testimony that at least suggests that Ms. Brown was upset about how much FMLA leave Ms. Seguin took. This evidence is more than enough for a reasonable jury to conclude that the reasons for her transfer were pretext for FMLA retaliation. And while the Department's

explanations for transferring Ms. Seguin may ultimately prove true, (and the Court has not ignored the very loud fact that the Department has not terminated Ms. Seguin's employment or denied a single leave request), a genuine dispute of material fact nonetheless remains.   Summary judgment shall be denied as it pertains to the transfers to the Belleview and Reddick clinics.

### C.    Other Instances of Purported Retaliation

Ms. Seguin points to two other purported instances of retaliation:   (1) the attempts to "trick" her into switching to a flexible work schedule; and (2) her probation upon her return to the Ocala clinic.  The undisputed material facts show that neither of these instances qualify as actionable retaliation.  The flexible work schedule issue is a non sequitur; Ms. Seguin was never placed on a flexible work schedule and never lost any benefits as a result of the discussion between herself, Ms. Brown, and Ms. Kash.  Simply put, she did not suffer any adverse employment action.

Although Ms. Seguin can arguably establish a prima facie case of retaliation as it pertains to her probation period, this claim fails due to a lack of any evidence of pretext.  The Department has submitted the deposition testimony of Ana Gray, the State of Florida Manager of Workforce Development and Benefits, who testified that all state employees must serve a probationary period when they are appointed to a new position, even if the appointment is by way of transfer.  See Doc. 35-7, pp. 35-36. Ms. Seguin also testified that she was aware she would have to go on probation if she

took the new Fiscal I position pursuant to State policy, and agreed to do so before accepting the transfer.

Ms. Seguin claims that other employees – none of whom worked in Human Resources or upper management – told her that lateral transfers were not subject to this probation policy.  See Doc. 35-1, pp. 87-88.  However, Ms. Seguin has not submitted any affidavits or depositions from these employees, and has not identified a single employee who was transferred to a new position and was not placed on probation.  Rather, Ms. Seguin relies on her own opinion and speculation that she was singled out for probation due to her FMLA leave.  "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."  Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (quoting Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 931-32 (7th Cir. 1995)) (emphasis omitted).

Summary judgment will be granted in favor of the Department on Ms. Seguin's FMLA retaliation claim as it pertains to the flexible work schedule discussion and her placement on probation.[22]

---

[22]To the extent Ms. Seguin is claiming retaliation based on comments made by Charity Woodburn that she was directed by Ms. Brown to harass and "nit-pick" Ms. Seguin, that claim also fails.  It is undisputed that Ms. Woodburn did not discipline Ms. Seguin or subject her to any adverse employment actions.  And any reliance on Ms. Seguin's 2007 performance evaluation also fails because it occurred far outside the applicable limitations period.

### III.    FCRA Retaliation Claim

Ms. Seguin's last claim is under the FCRA and asserts that the Department retaliated against her for filing her two EEOC charges, which alleged disability discrimination and retaliation.

In the absence of direct evidence, as in this case, FCRA retaliation cases are also evaluated under the McDonnell Douglas burden-shifting framework discussed above.  See Holly v. Clairson Industries, L.L.C., 492 F.3d 1247, 1255 (11th Cir. 2007). With respect to her prima facie case, it is undisputed that Ms. Seguin engaged in protected activity when she filed her two EEOC charges.  On the question of adverse employment actions, Ms. Seguin references three instances of purported FCRA retaliation:  (1) Ms. Johnson Duran's March 24, 2011 letter asking that Ms. Seguin be fired; (2) her transfer to the Belleview and Reddick clinics in April and June 2011; and (3) her probation.

For the same reasons previously discussed, the Court finds that the transfer to the other clinics and the placement on probation constitute adverse employment actions.  And, as previously discussed, the Court also finds that Ms. Seguin has submitted sufficient evidence for a reasonable fact finder to hold that the Department's reasons for transferring her were pretext for retaliation.  The same analysis also applies to the probation claim – Ms. Seguin has failed to create any fact issues suggesting pretext.  Accordingly, summary judgment is due to be denied on the FCRA

claim as it pertains to the transfer to the other clinics, and granted as it pertains to Ms. Seguin's probation.[23]

Ms. Johnson Duran's March 24, 2011 letter does not qualify as actionable retaliation for the simple fact that Human Resources and upper management took no action based on the letter.  Instead, Ms. Johnson Duran was herself transferred and removed from her supervisory role.  There is also no evidence in the record that Ms. Seguin was aware of the March 24, 2011 at the time it was written, such that she can argue that it caused her harm or discouraged her from engaging in protected activity. Moreover, Ms. Seguin has not presented any legal authority – and the Court has not located any – to support her contention that a letter recommending a course of disciplinary action which was never actually taken, and which the employee was not aware of at the time, can constitute an adverse employment action for purposes of a retaliation claim.  Summary judgment will therefore be denied on Ms. Seguin's FCRA retaliation claim as it pertains to the March 24, 2011 letter from Ms. Johnson Duran.

---

[23]It is undisputed that Cheryl Brown, the person who made the transfer decisions, was aware of Ms. Seguin's EEOC charge when she transferred her to the Belleview and Reddick clinics.  Although approximately four months elapsed between the time Ms. Seguin filed her first EEOC charge and she was transferred to the Belleview clinic, the Court finds that there is sufficient other evidence from which a reasonable jury could find a causal connection between the filing of the charge and her transfer.  In any event, Ms. Seguin filed her second charge on June 15, 2011, two weeks before she started working at the Reddick clinic.

## **Conclusion**

Accordingly, upon due consideration, it is hereby ORDERED that Defendant Marion County Health Department's Motion for Summary Judgment (Doc. 33) is GRANTED IN PART AND DENIED IN PART.   Summary Judgment is GRANTED in favor of the Department and against Plaintiff Melissa Seguin as to her FMLA interference claim (Doc. 20, Count I), and as to the portions of her FMLA and FCRA retaliation claims (Doc. 20, Counts II-III), relating to her placement on probation, the discussion of switching to a flexible work schedule, and the March 24, 2011 letter from Patricia Johnson Duran to Human Resources.   In all other respects, the motion (Doc. 33) is DENIED.   The Clerk is directed to withhold the entry of judgment pending final resolution of all remaining claims.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 13th day of August, 2014.


UNITED STATES DISTRICT JUDGE


Copies to:    Counsel of Record
                      Maurya McSheehy